UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANGELA HAGGERTY,

                             Plaintiff,

        v.                                      3:10-CV-306
                                              (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                             Defendant.
_____

PETER A. GORTON, ESQ., for Plaintiff
THOMAS C. GRAY, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

      This matter was referred to me for report and recommendation by the

Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## I.    PROCEDURAL HISTORY

      Plaintiff "protectively filed" an application for disability insurance benefits

and Supplemental Security Income ("SSI") on December 10, 2007, claiming

disability since December 19, 2004.  (Administrative Transcript ("T.") at 33-35; 13).[1]

 Plaintiff's application was initially denied on March 25, 2008 (T. 21-22; 13), and

_____

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. §§ 404.630, 416.340.  There are various requirements for this written statement.  *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

she requested a hearing before an Administrative Law Judge ("ALJ") (T. 24-30; 13).

The hearing, at which plaintiff testified, was conducted on June 25, 2009.  (T. 314-

36).

In a decision dated September 3, 2009, the ALJ found that plaintiff was not

disabled.  (T. 13-20).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

February 26, 2010.  (T. 6-9).

## II.   MEDICAL EVIDENCE

Plaintiff's medical history involves diagnoses and treatment for

hydrocephalus;[2] chronic migraine headaches; and anxiety, depression, and various

other cognitive and mental health issues.  The medical evidence begins with records

of the Southern New York NeuroSurgical Group, which treated plaintiff's

hydrocephalus since her birth.  (T. 123-24, 141-75).  Between 2002 and late 2007,

doctors (primarily Daniel D. Gaylon, M.D.) and a physician assistant (Joseph R.

Garrehy) periodically saw plaintiff regarding chronic and severe headaches.  After

---

[2] The primary characteristic of hydrocephalus is excessive accumulation, in the brain, of cerebrospinal fluid ("CSF")–a clear fluid that surrounds the brain and spinal cord.  The buildup of CSF results in an abnormal widening of spaces in the brain called ventricles.  This widening creates potentially harmful pressure on the tissues of the brain.  Hydrocephalus is most often treated by surgically inserting a shunt–a flexible, but sturdy plastic tube system.  The shunt system diverts the flow of CSF from around the brain to another area of the body where it can be absorbed as part of the normal circulatory process.  *Hydrocephalus Fact Sheet*, National Institute of Neurological Disorders and Stroke, National Institutes of Health: http://www.ninds.nih.gov/disorders/hydrocephalus/detail_hydrocephalus.htm.  The plaintiff had a shunt, draining to her stomach, surgically implanted shortly after her birth in 1983.  The shunt system was "revised" several times, most recently in 1995.  (T. 121, 279, 281).

repeated examination, testing, and consultation, members of the neurosurgery practice consistently concluded that plaintiff's headaches were "migrainous" in nature, not the result of any problems relating to her hydrocephalus or the shunt system that was implanted at birth to treat that condition. (T. 141-152). Plaintiff was referred to a neurologist for treatment of her headaches. (T. 141, 142, 145). Although Dr. Gaylon stated, in December 2007 that he did not see any reason why the plaintiff could not engage in gainful employment, he deferred to her primary care doctor or consulting neurologist with respect to her request for an out-of-work slip. (T. 141).

Between April 2005 through at least 2009, neurologist Taseer Minhas, M.D., periodically treated plaintiff for chronic headaches. (T. 186-89, 283-86, 299, 309-10). He tried various medications for plaintiff's headaches over the years, with limited success. (T. 186-87, 309-310). In his last report in May 2009, Dr. Minhas confirmed, as consistent with plaintiff's medical condition, her claims that she suffered from "severe" migraines three to seven times per week. (T. 299). Plaintiff was also occasionally seen, for her headaches, by other medical professionals, including emergency room personnel. (T. 121-130, 176-77, 300-308).

On January 11, 2008, Uzma Anis, M.D., saw plaintiff when she was five-months pregnant with her fourth child. Dr. Anis noted, *inter alia*, that plaintiff reported symptoms and a history of anxiety/panic attacks and claustrophobia, for

3

which the doctor considered a prescription of Zoloft.  (T. 176-77).  Shortly thereafter,

Dr. Minhas noted that plaintiff displayed significant symptoms of anxiety and

depression, and cited that as a cause of her headaches.  (T. 187).  Between August

2008 and at least April 2009, plaintiff was treated by the Broome County Mental

Health Department, primarily by Clinical Social Worker Jill Meskunas-Van Pelt, for

what was ultimately diagnosed as anxiety disorder.  (T. 270-282, 293-98).  In April

2009, LCSW Van Pelt prepared a mental health questionnaire rating plaintiff's

impairments as "marked" for the majority of the criteria relating to concentration and

persistence; interaction with others; and adaption/stress.  (T. 293-94).

    In February 2008, plaintiff underwent an internal medicine examination, by

Justine Magurno, M.D., in connection with her applications for SSI and disability

insurance.  Dr. Magurno diagnosed, *inter alia*, plaintiff's headaches and history of

social anxiety disorder.  The doctor found it difficult to assess the degree to which

plaintiff's functioning was limited, because she was not suffering from a headache at

the time of the examination, and because the doctor did not have access to the

records of plaintiff's prior treatment.  (T. 190-94).

    Psychologist Mary Ann Moore conducted a psychiatric evaluation (T. 195-

200) and an intelligence evaluation (T. 201-206) of plaintiff in February 2008.  Dr.

Moore diagnosed plaintiff with panic disorder, social phobia, depressive disorder,

and impulse control disorder, and noted that her "psychiatric problems . . . may

significantly interfere with her ability to function on a daily basis."  (T. 198-99).  Dr. Moore also concluded that plaintiff had "borderline intellectual functioning" (with a full-scale IQ of 74) and "cognitive problems" which could cause problems with "maintaining a regular work schedule and making appropriate work decisions . . ." and "dealing adequately with others."  (T. 204-205).  However, Dr. Moore opined that plaintiff could follow and understand simple directions and perform simple tasks under supervision.  (T. 198, 204).

A state-agency psychologist, Dr. Edward Kamin, completed a psychiatric review of the medical evidence and a mental residual functional capacity assessment on March 25, 2008.  (T. 248-62, 263-68).  He opined that plaintiff's medically determinable impairments did not satisfy the diagnostic criteria associated with Listing categories 12.04 (Affective Disorders), 12.05 (Mental Retardation), 12.06 (Anxiety-Related Disorders), and 12.08 (Personality Disorders).  (T. 248, 251-53, 255, 258-61).  Dr. Kamin found, *inter alia*, that plaintiff had a marked limitation with respect to carrying out detailed instructions and moderate limitations with respect to several other criteria relating to understanding and memory, sustained concentration and persistence, social interaction, and adaption.  (T. 263-64).  He noted that no treating source had provided a work-related statement.  (T. 265).

The court will not set forth here the details of the medical evidence, which is summarized in both Plaintiff's Brief (at 1-5, Dkt. No. 9) and the Defendant's Brief

(at 2-9, Dkt. No. 12).  Other relevant aspects of the medical evidence are discussed below in the course of analyzing the issues disputed by the parties.

## III.   TESTIMONY AND NON-MEDICAL EVIDENCE

Born in 1983, plaintiff was age 25 at the time of the hearing on June 25, 2009. (T. 321).  The plaintiff had a difficult and troubled childhood, much of which was spent in foster homes.  (T. 279-80).  She left school in the eighth grade and, after several unsuccessful attempts, earned her GED in 2008.  (T. 280, 321).  She lives with a boyfriend and four children, ages seven, six, four, and one.  (T. 321).

Plaintiff is able to attend to her children, cook, do dishes, clean, do laundry, and care for herself, although she needs assistance from her boyfriend and sister when she is debilitated by migraine headaches.  (T. 64-68, 324, 326).  Plaintiff testified that she has problems with migraines "every day."  When they are "really bad," the headaches make plaintiff dizzy, cause her vision to blur, and make her sick to her stomach, requiring her to lie down, with the lights off, for four to five hours. (T. 323-24).  Although she runs errands and keeps appointments outside the home, plaintiff claims to be anxious around others outside her home, particularly in crowds. (T. 67-68, 272-73, 326-27).

Plaintiff had a limited work history, which included a position as a cashier and stock person at a gas station/convenience store, which was full-time for much of 2004, and part-time for a few months in 2006.  (T. 42, 48-50, 280, 321-22).  She

stopped working because of increasing anxiety, more severe headaches, and the impact of her work on her ability to care for herself.  (T. 50, 272, 322-23).

## IV.    THE ALJ'S DECISION

In the ALJ's September 3, 2009 decision, she acknowledged that plaintiff met the insured status requirements of the Social Security Act through December 31, 2006, and found that plaintiff had not been engaged in substantial gainful activity since December 19, 2004–the alleged onset date.  (T. 15).  The ALJ determined that the plaintiff's migraine headaches, borderline intellectual functioning, and anxiety disorder were "severe" impairments, but found that they did not rise to the level of any impairment listed in Appendix 1 of 20 C.F.R., Part 404, Subpart P.  (T. 15-18).

The ALJ concluded that plaintiff retained the residual functional capacity to perform a full range of work at all exertional levels.  The ALJ found that the plaintiff had non-exertional limitations which nonetheless left her with the ability "to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for tasks; regularly attend to a routine and maintain a basic schedule; relate to and interact appropriately with others; and deal with work-related stress with little change from day to day." (T. 18).  The ALJ determined that plaintiff could perform her past work as a convenience store clerk/cashier, and thus, that plaintiff was not disabled.  (T. 19).

The ALJ concluded that plaintiff's subjective statements regarding the

intensity, persistence, and limiting effects of her symptoms were not credible to the

extent they were inconsistent with the ALJ's RFC assessment.  (T. 18-19).   The ALJ

placed great weight on the opinions "from primary treating physician Dr. Minhas,"

although she inaccurately attributed, to Dr. Minhas, Dr. Gaylon's December 2007

statement regarding plaintiff's ability to work.  (T. 19; Deft.'s Brief at 17-18).  She

also placed great weight on the opinions of Dr. Moore and State Agency Expert Dr.

Kamin, but discounted the findings of plaintiff's treating social worker/therapist.  (T.

19).

## V.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.   The ALJ erroneously evaluated treating source opinions (Pltf.'s Brief at
      5-10), and failed to adequately develop the record with respect to
      treating sources (Pltf.'s Reply Brief at 1-2, Dkt. No. 13-1).

2.   The ALJ failed to properly consider non-exertional impairments in her
      residual functional capacity ("RFC") analysis.  (Pltf.'s Brief at 10-14;
      Pltf.'s Reply Brief at 1-2).

3.   The ALJ improperly assessed the credibility of the plaintiff's statements
      regarding her symptoms and limitations.  (Pltf.'s Brief at 14-19; Pltf.'s
      Reply Brief at 2).

This court concludes, for the reasons set forth below, that the ALJ was

inaccurate and inappropriately selective in her consideration of the medical and

opinion evidence regarding the plaintiff's chronic migraine headaches and various

mental health issues.  In assessing plaintiff's RFC, the ALJ failed to adequately

develop the record, and did not properly consider the cumulative impact of all of

plaintiff's impairments, particularly the impact of her headaches and depression.  The ALJ improperly determined that plaintiff's subjective statements regarding her symptoms and limitations were not consistent with the medical and other evidence. This court concludes that the ALJ did not appropriately document her RFC assessment with respect to non-exertional impairments, or her conclusion that plaintiff could perform her past work, such that this court cannot determine whether those findings are supported by substantial evidence.  Accordingly, it is recommended that the case be remanded so that the ALJ can properly develop the record, evaluate the totality of the medical and opinion evidence, reconsider plaintiff's credibility, and re-assess her RFC.

## VI.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he/she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. § 404.1520 (disability insurance benefits) & § 416.920 (SSI).  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that her impairment prevents her from performing his/her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

**B.   Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing, *inter alia*, Johnson *v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the

proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his/her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Williams*, 859 F.2d at 258.

An ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

11

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## VII. ANALYSIS

### A. The ALJ's Evaluation of the Medical Evidence and the RFC Determination Regarding Non-Exertional Limitations

#### 1. Legal Standards

##### a. RFC Assessment

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a

narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

It is well-settled that the combined effect of all plaintiff's impairments must be considered in determining disability. *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995). The ALJ must evaluate the combined effect of plaintiff's impairments on his/her ability to work, "regardless of whether every impairment is severe." *Id.* (citing *inter alia DeLeon v. Secretary of HHS*, 734 F.2d 930, 937 (2d Cir. 1984)). The regulations define a "non-severe" impairment as one that "does not significantly limit [the plaintiff's] physical or mental abilities to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). Basic work activities are defined as "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These basic work activities include mental capacities, such as understanding, carrying out, and remembering simple instructions, as well as the use of judgment. 20 C.F.R. §§ 404.1521(b)(3), (b)(4); 416.921(b)(3), (b)(4). Other mental capabilities–e.g., responding appropriately to supervision, co-workers, and usual work situations, and dealing with changes in a routine work setting–are also considered basic work activities. 20 C.F.R. §§ 404.1521 (b)(5), (b)(6); 416.921 (b)(5), (b)(6).

**b.    Treating Physician**

While a treating physician's opinion is not binding on the Commissioner, the

opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected.  *Id.*  An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### c.      ALJ's Duty to Develop the Record

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999);  20 C.F.R. §§ 404.1512(d), 416.912(d). ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.")  In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination.  20 C.F.R.§§ 404.1512(e), 416.912(e).

### 2.      Application

Plaintiff argues that, in evaluating the medical evidence and determining the

RFC, the ALJ selectively credited the evidence that supported her conclusions, while ignoring or not giving proper weight to contrary evidence.  Plaintiff also contends that the ALJ's findings are based on a misreading of some of the relevant medical evidence.  (Pltf.'s Brief at 9-10).  Finally, plaintiff takes the position that the ALJ should have re-contacted treating sources, particularly Dr. Minhas, to properly develop the record regarding plaintiff's RFC.  (Pltf.'s Reply Brief at 2).  The court agrees with these arguments and concludes that, as currently documented in her decision, the ALJ's RFC determination is not supported by substantial evidence.

### a.    Dr. Minhas

The ALJ characterized neurologist Taseer Minhas, M.D. as "the primary treating physician" and purported to give his opinions "great weight."  (T. 19).  However, the ALJ's decision was inaccurate and selective in its discussion of Dr. Minhas' opinions and failed to adequately develop the record with respect to this treating source.

The ALJ emphasized Dr. Minhas' statements in September 2008 (T. 286) that plaintiff's overuse of non-prescription medication might be playing a role in her headaches and that, as of April 2009 (T. 309-10), "her headaches, though perhaps somewhat more frequent, were clearly less severe due to partially successful medications."  (T. 16).  Earlier statements of Dr. Minhas in January 2008, not cited by the ALJ,  established that a variety of medications had not succeeded in mitigating plaintiff's "aching and throbbing" headaches, which disturbed her sleep and left her "sad and depressed."  (T. 186).  In September 2008, when plaintiff stated that her

"incapacitating" headaches made her feel like her "brain is being squeezed," Dr. Minhas started prescribing Nortriptyline to plaintiff.  (T. 285-86).  He increased the dosage of that medication in December 2008 when plaintiff continued to complain of headaches associated with light and noise phobias and nausea.  (T. 283-84).  Although Dr. Minhas did note plaintiff's statements that her "daily" headaches were not as severe in April 2009, he again increased the dosage of her medication, and stated "**[o]nce the Nortriptyline starts to work** [plaintiff] should seriously consider decreasing the frequency of her use of Tylenol."  (T. 309-10 (emphasis added)).

In May 2009, Dr. Minhas responded to a Social Security questionnaire and stated that plaintiff's claims of "severe" migraines three to seven times per week were consistent with her medical condition.  (Hearing Ex. 21F, T. 299).  The ALJ did not mention the most recent (May 2009) statement of Dr. Minhas in her decision, and apparently discounted the testimony of plaintiff at the hearing in June 2009 that she did not think the Nortriptyline was "helping" her.  (T. 323).  In short, the ALJ selectively referenced the opinions of Dr. Minhas to understate the severity of plaintiff's symptoms from headaches and overstate the positive impact of medication.

The only other statement of Dr. Minhas referred to in the ALJ's decision was his "December 2007 pronouncement . . . (Exhibit 6F)."  (T. 19).  The cited statement was, in fact, the observation of neurosurgeon Daniel Gaylon, M.D., that he did not see any reason why plaintiff "cannot be engaged in gainful employment."  However, Dr. Gaylon, not seeing "any role for direct neurosurgical intervention," referred plaintiff back to Dr. Minhas at that time, and deferred to the neurologist and/or

plaintiff's primary care physician "in terms of how to proceed with [her] request for an out-of-work slip."  (T. 141).

Dr. Minhas, to whom Dr. Gaylon deferred, found plaintiff's headache symptoms to be severe and debilitating in various reports (discussed above) in 2008. While Dr. Gaylon's opinion may be entitled to some weight, the ALJ stated he gave great weight to Dr. Minhas–the primary treating physician regarding plaintiff's migraines–not Dr. Gaylon, who focused on the absence of any causal connection between plaintiff's hydrocephalus and her headaches.  (T. 19).  Because the ALJ was inaccurate and inappropriately selective in presenting Dr. Minhas' opinions in his decision, and because of the uncertainty regarding the medical opinions on which the ALJ actually relied, this court cannot conclude that her RFC finding is supported by substantial evidence.  *See, e.g.*, *Ebert v. Astrue*, 1:07-CV-1166 (LEK/DEP), 2009 WL 3764219, at *8-9 (N.D.N.Y. Nov. 10, 2009) (by ignoring contrary medical evidence in the record and discounting plaintiff's testimony regarding the severity of her symptoms, the ALJ "plainly failed to consider the cumulative impact of all of plaintiff's impairments, most notably the contributing affects of her headaches" in assessing her RFC); *Groff v. Commissioner of Social Sec.*, 7:05-CV-54 (NAM/RFT), 2008 WL 4104689, at *6-8, 11-12 (N.D.N.Y. Sept. 3, 2008) (where the ALJ incorrectly recited the medical record regarding plaintiff's migraine headaches and did not seek clarification of the treating physician's reasons for finding the headaches disabling, the case must be remanded for proper development of the record and reassessment of plaintiff's RFC).  Hence, this case should be remanded so

that the ALJ can reassess her RFC and clearly articulate the basis for her findings.

Despite two notations in the Social Security record about the lack of any statement from plaintiff's treating physician about the impact of plaintiff's headaches on her ability to work (T. 218, 265), the supplemental questionnaire directed to Dr. Minhas in May 2009 did not solicit his opinion on that critically important subject. (T. 299).  The failure to re-contact Dr. Minhas to solicit his opinion on plaintiff's ability to work and the continuing impact of medication on plaintiff's headaches constitutes a breach of the ALJ's duty to develop the record, and also warrants a remand.  *See, e.g., Crysler v. Astrue,* 563 F. Supp. 2d 418, 435, 443 (N.D.N.Y. 2008) (particularly given the ALJ's mis-characterization of a treating physician's views about the limitation on plaintiff's functional abilities, the case should be remanded so that the treating physician may be re-contacted); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 440-41 (S.D.N.Y.2003) (remanding due to ALJ's failure to fill in gaps in the record with a treating source opinion about the plaintiff's ability to perform work-related functions); *Rosa v. Apfel*, 97 Civ. 5831, 1998 WL 437172, at *4 (S.D.N.Y. July 31, 1998) (remanding because the ALJ failed to follow-up on a request to receive a functional assessment).

### b.    Mental Health Sources

The ALJ purported to give "great weight" to consulting examiner, Dr. Moore, and State Agency expert, Dr. Kamin, with respect to mental-health-related limitations on plaintiff.  Again, the ALJ selectively relied on the statements of these experts in her RFC assessment, rejecting the contrary opinion of plaintiff's therapist and

discounting the statements of plaintiff about her mental health problems.  On remand, the ALJ should reassess the impact of plaintiff's mental health issues on her RFC, and more clearly and completely articulate supporting reasons.

The ALJ correctly noted that Dr. Moore, who examined plaintiff once, opined that plaintiff "might have some problems handling stress and being around others, as well as making work decisions and maintaining a schedule."  (T. 16).  The ALJ did not, however, note Dr. Moore's general conclusion that the plaintiff's psychiatric and cognitive problems "may significantly interfere with her ability to function on a daily basis."  (T. 198, 204).  The ALJ stated that the State Agency assessment concluded that plaintiff's only significant non-exertional limitation "involved 'moderate' limits on attention/concentration and pace" (T. 16) and concluded that plaintiff has "no more than mild difficulties" "in social functioning" (T. 17).  The ALJ's decision did not acknowledge that the State Agency expert also concluded that plaintiff had "marked" limitations with respect to the "ability to carry out detailed instructions" and moderate limitations with respect to the "ability to remember locations and work-like procedures," the "ability to interact appropriately with the general public," the "ability to respond appropriately to changes in the work setting," and the "ability to set realistic goals or make plans independently of others."  (T. 264-65).  Based on the selective summary of the medical evidence, the ALJ found that the plaintiff could "maintain attention/concentration for [simple] tasks; regularly attend to a routine and maintain a basic schedule; relate to and interact appropriately with others; and deal with work-related stress with little change from day to day."  (T. 18).

19

Clinical Social Worker Jill Meskunas-Van Pelt of the Broome County Department of Mental Health treated plaintiff between August 2008 and at least April 2009, seeing plaintiff at least six times.  (T. 272, 275, 278, 279-81, 297, 298, 325).  Ms. Van Pelt concluded that plaintiff suffered from anxiety disorder and had a global assessment of functioning score of 53, reflecting "moderate" symptoms.[3]  (T. 270, 281).  In a questionnaire completed in April 2009, LCSW Van Pelt reported that plaintiff had "marked" impairments in the areas of concentration and persistence and adaption/stress, and between moderate and marked limitations in the area of interaction with others.  (T. 293-94).  The ALJ gave "little weight" to Ms. Van Pelt's conclusions, stating they were supported "by only three visits over a period of less than four months" (T. 19), noting that Ms. Van Pelt is not "an acceptable medical source," and concluding that her conclusion did not comport with the remainder of the medical evidence in the case file.  (T. 17).

The ALJ is correct that a clinical social worker's opinion is not entitled to controlling weight, because she is not an "acceptable medical source."  *See* 20 C.F.R. §§ 404.1513(a), 404.1527(d)(2), 416.913(a), 416.927(d)(2).  However, Ms. Van Pelt's opinions, which are supported by factual treatment notes, are entitled to significant weight, to the extent they are consistent with substantial evidence from

---

[3] A person's GAF is described as a "clinician's judgment of the individual's overall level of functioning" taking into account "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness."  *Diagnostic and Statistical Mental Disorders* 32, 34 (4th ed., Text Revision 2000).  A GAF of between 51 and 60 indicates "[m]oderate symptoms (e.g. . . . occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.* few friends, conflicts with peers or co-workers)."  *Id.* at 34 (emphasis in original).  *Ebert v. Astrue*, 2009 WL 3764219, at *2 n.2.

acceptable medical sources.  *See* Security Ruling (SSR) 06-03p, 2006 WL 2329939, at *5-6 (opinions from "non-medical sources" who have seen the individual in their professional capacity should be evaluated  using the applicable factors, including how consistent the opinion is with other evidence and the degree to which the source presents relevant evidence to support an opinion).  Given that the ALJ apparently did not consider all of the applicable reports from Broome County Mental Health, and her selective presentation of the mental health evidence from two other medical sources who saw the plaintiff a total of one time, it is appropriate that, on remand, the ALJ be directed to do a more thorough review of the evidence relating to plaintiff's mental health limitations.

Dr. Moore's diagnoses of plaintiff included panic disorder, social phobia, depressive disorder, impulse control disorder, and borderline intellectual functioning. (T. 199, 205).  LCSW Van Pelt's primary mental health diagnosis of the plaintiff was anxiety disorder.  (T. 294).  Following his review of the medical evidence, Dr. Kamin referenced the plaintiff's complaints of anxiety and depression.  (T. 264-65).  The ALJ's decision included only borderline intellectual functioning and anxiety disorder among plaintiff's severe impairments (T. 15), and did not appear to consider plaintiff's diagnosed depression in the RFC assessment (T. 18-19).  While there may be some overlap among the various diagnoses of plaintiff's mental health problems, on remand, the ALJ should consider all established impairments, even if they are found not to be severe.  *See, e.g., Burgin v. Astrue*, 348 Fed. Appx. 646 (2d Cir. 2009) (plaintiff's case must be remanded for further administrative proceedings,

because the Commissioner, when determining her RFC to engage in any substantial gainful activity, referenced only her bipolar disorder and failed to account for her diagnosed depression).

### B.   The ALJ's Assessment of Plaintiff's Statements Regarding Subjective Symptoms and Limitations

#### 1.   Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the

objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 2.   Application

The ALJ discounted that testimony of plaintiff regarding the severity of her symptoms from headaches and anxiety, and the resulting limitations on her ability to function.  (T. 18-19).  Plaintiff testified that she "can't function like a normal person when I'm at work and I just feel out of place" and that she gets "tongue-tied" in that setting.  (T. 18; 322-23).  Plaintiff claimed that she suffered panic attacks at work when there were a lot of customers, as well as in other crowded places and around people other than her family; although she acknowledged that she takes no medication for anxiety.  (T. 18; 325, 328, 331-32).  She testified that she has problems with headaches every day that, when "really bad," she must lie down for hours because she is dizzy, nauseous, and has blurry vision.  (T. 18; 324).

In performing her credibility analysis, the ALJ found that plaintiff's medically

determinable impairments could reasonably be expected to cause some of the alleged symptoms.  However, the ALJ he found that plaintiff's statements regarding the intensity and limiting effect of those symptoms were not credible to the extent inconsistent with the ALJ's conclusion that the plaintiff could perform simple, routine work.  (T. 19).

In assessing the credibility of plaintiff's statements regarding her symptoms and limitations, the ALJ noted that plaintiff had earned her GED in 2008, albeit after several tries.  The ALJ also stated that the plaintiff took care of her children; did most of the routine household chores; visited with friends; read; and sometimes shopped with another person coming along.  (T. 18-19).  In fact, the plaintiff consistently stated that she requires assistance because her migraine headaches frequently interfered with her ability to care for children and perform daily chores. (T. 64-66, 324, 326).  Plaintiff also denied visiting with anyone other than her boyfriend and family.  (T. 68, 326-27).

The ALJ also stated that plaintiff was "generally speaking successful" when she worked full-time at the Hess Mart for awhile, but told "her treating doctor" that she left that job because she needed to "take some time off 'for herself.' (Exhibit 18F)"  (T. 19).  In fact, the ALJ misquoted the cited exhibit,[4] a progress note of Clinical Social Worker Van Pelt, which reported that plaintiff worked full-time at Hess Mart before she became "anxious/panicky," but found that "taking care of

---

[4] Nothing in the cited document provides any support for the ALJ's statement that the plaintiff was generally successful in her job at Hess Mart, which she held full-time for no more than eight months.  (T. 50).

herself suffered when she worked that many hours." (T. 272). In several contexts, plaintiff also stated that she reduced her hours and then stopped working because her headaches became more severe. (T. 48, 50, 54, 297, 322, 328). Given the acknowledged connection between plaintiff's headaches and her anxiety/depression (T. 16), her various statements about why she quit work do not appear to be inconsistent.

Given some of the inaccuracies in the ALJ's summary of the plaintiff's statements and the purportedly inconsistent other evidence, the credibility analysis was flawed. *See, e.g.*, *Horan v. Astrue*, 350 Fed. Appx. 483, 485 (2d Cir. 2009) (when ALJ's credibility analysis was largely based on factual errors involving plaintiff's purported testimony and alleged inconsistencies with other evidence, it is not supported by substantial evidence); *Genier v. Astrue*, 606 F.3d 46, 48-49, 50 (2d Cir. 2010) (remanding case where ALJ credibility determination was based on the statement that plaintiff admitted that he was able to perform certain household tasks when, in fact, he testified that he *tried* to do those tasks, but required assistance because of severe fatigue). Moreover, the ALJ's credibility assessment was based in part, on perceived, but unspecified, inconsistencies between plaintiff's claims and the medical evidence. Given the errors in the ALJ's summary of the medical evidence (discussed above), that aspect of the credibility analysis is also flawed and should be reassessed on remand. Finally, the court agrees with plaintiff (Pltf.'s Brief at 18; Pltf.'s Reply Brief at 2) that the ALJ's conclusory observation that plaintiff's testimony was not credible because it was perceived as "well rehearsed" does not, by

itself, provide a sufficient basis to find that the ALJ's credibility determination is supported by substantial evidence.

### C.    The Determination that Plaintiff Could Return to her Past Work

Given the deficiencies in the ALJ's RFC analysis, her finding that the plaintiff could return to her past work is also flawed and should be reconsidered on remand. Non-exertional limitations could have an impact on plaintiff's ability to work, even in the relatively simple position of a gas station/convenience store cashier/clerk, and should be considered. *See, e.g., Kochanek v. Astrue*, 08-CV-310 (GLS/VEB), 2010 WL 1705290, at *11 (N.D.N.Y. Apr. 13, 2010) ("'. . . in order to determine at step four whether a claimant is able to perform her past work, the ALJ must make a specific and substantial inquiry into the relevant physical **and mental** demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities.'") (quoting *Kerulo v. Apfel*, 98 Civ.7315, 1999 WL 813350, at *8 (S.D.N.Y. Oct.7, 1999) (emphasis added).

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper determination of plaintiff's residual functional capacity to perform her past work and other further proceedings, consistent with this Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14**

**DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d
85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d
15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: February 14, 2011


Hon. Andrew T. Baxter
U.S. Magistrate Judge

27